```
                                        FILED
                              CLERK, U.S. DISTRICT COURT

                                   JAN 18 20..

                              CENTRAL DISTRICT OF CALIFORNIA
                              BY                        DEPUTY
```

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, | CASE NO. SA CV 07-00698 ABC (RZ) |
|       Petitioner, | Consolidated with |
| | CASE NO. SA CV 05-01098 ABC (RZ) |
| vs. | |
| | ORDER ACCEPTING FINDINGS AND |
| J. WOODFORD, CDC Director, | RECOMMENDATIONS OF UNITED |
| | STATES MAGISTRATE JUDGE |
|       Respondent. | |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the both the First Amended Petition filed in case no. SA CV 05-01098 ABC (RZ) and the Petition filed in case no. SA CV 07-00698 ABC (RZ), records on file, and the Report and Recommendation of United States Magistrate Judge. Further, the Court has engaged in a de novo review of those portions of the Report to which Petitioner and Respondent have objected. The Court accepts the findings and recommendations of the Magistrate Judge.

DATED: Jan. 17, 2008

Audrey B Collins
AUDREY B. COLLINS
UNITED STATES DISTRICT JUDGE

DUPLICATE ORIGINAL

CLERK, U.S. DISTRICT COURT

NOV  5 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ,

          Petitioner,

    vs.

J. WOODFORD, CDC Director,

          Respondent.

)
)
)
)
)
)
)
)
)
)

CASE NO. SA CV 07-00698 ABC (RZ)
Consolidated with
CASE NO. SA CV 05-01098 ABC (RZ)

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE

Pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California, the undersigned submits this Report and Recommendation to the Honorable Audrey B. Collins, United States District Judge. The undersigned recommends that the Court deny both the First Amended Petition for Writ of Habeas Corpus filed in case no. CV 05-01098 ABC (RZ) and the Petition for Writ of Habeas Corpus filed in case no. CV 07-00698 ABC (RZ) and dismiss the consolidated action with prejudice.

## I.

On June 21, 2002, an Orange Superior Court jury convicted Petitioner Carlos Sanchez of conspiracy to commit murder for the benefit of a criminal street gang and by personally using and discharging a firearm, of shooting at an inhabited dwelling and



attempted premeditated murder (each for the benefit of a criminal street gang and with the personal use of a firearm), and of street terrorism and being a gang member carrying a loaded firearm in a vehicle in public (CAL. PENAL CODE §§ 182(1), 186.22(a), 186.22(b)(1), 187/664, 246, 12022.5(a), 12022.53(b), 12022.53(c), 12031(a)(1)/12031(a)(2)(c)).   (Clerk's Transcript ("CT") 718-33, 756-58, 875-78; Reporter's Transcript ("RT") 1165-68.) The court sentenced Petitioner to 45 years to life in state prison. (CT 862-64, 875-78; RT 1201-02.) The California Supreme Court denied review on September 1, 2004. (Lodgment No. 16.)  The United States Supreme Court denied Petitioner's petition for writ of certiorari on January 24, 2005.  (2005 First Amended Petition,[1] at 7; Electronic Docket of the United States Supreme Court.)

On February 8, 2005, Petitioner filed a petition for writ of habeas corpus in the Orange County Superior Court which the court denied on March 11, 2005. (Lodgment Nos. 17, 18.) On April 19, 2005, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal which the court denied on May 12, 2005. (Lodgment Nos. 19, 20.)  On May 26, 2005, Petitioner filed a petition for habeas relief in the California Supreme Court which the court denied on May 17, 2006. (Lodgment No. 21; Response to 2007 Petition, Exh. 2.)

On November 9, 2005, Petitioner filed the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 initiating case number SA CV 05-01098 ABC (RZ) in this Court.  Petitioner filed the First Amended Petition under consideration herein (the 2005 First Amended Petition) on December 8, 2005. The claims raised in this amended petition challenge the fairness of Petitioner's criminal trial and sentence. Respondent contends that these claims are defaulted and/or fail on their merits.

---

[1] References to Petitioner's "2005 First Amended Petition" are to the First Amended Petition filed in case number SA CV 05-01098 ABC (RZ).  The additional petition under consideration herein – the one originally filed in the now consolidated case of SA CV 07-00698 ABC (RZ) – is referred to as Petitioner's "2007 Petition."

On June 15, 2007, in case number SA CV 07-00698 ABC (RZ), Petitioner filed in this Court a new petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). In this petition, Petitioner challenges the juvenile court proceedings leading up to his trial in adult court.

On July 12, 2007, the Court ordered the cases consolidated and required Respondent to respond to the claims in the 2007 Petition. Respondent argues that the claims therein fail for procedural reasons and on their merits. The Court has considered both the procedural and substantive contentions of both parties as to all of Petitioner's claims.

## II.

When reviewing the merits of the claims raised in Petitioner's petitions, the Court proceeds under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, which provides in part:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1   28 U.S.C. § 2254. Under the AEDPA, a federal court shall presume that a determination
2   of factual issues made by a state court is correct, and a petitioner has the burden of
3   rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).
4   The Supreme Court has explained the standard of review under the AEDPA
5   as follows:

6
7   Under the "contrary to" clause, a federal habeas court may grant
8   the writ if the state court arrives at a conclusion opposite to that
9   reached by [the Supreme Court] on a question of law or if the
10   state court decides a case differently than [the Supreme Court]
11   has on a set of materially indistinguishable facts. Under the
12   "unreasonable application" clause, a federal habeas court may
13   grant the writ if the state court identifies the correct governing
14   legal principle from [the Supreme Court's] decisions but
15   unreasonably applies that principle to the facts of the prisoner's
16   case.

17
18   *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A
19   state court's decision is an "unreasonable application" of Supreme Court precedent if it is
20   "objectively unreasonable" which "requires the state court decision to be more than
21   incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166, 155 L. Ed.
22   2d 144 (2003); *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1169-70 (9th Cir. 2003). Thus,
23   "an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S.
24   685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *accord Price v. Vincent*, 538 U.S.
25   634, 643, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2003) (even where reviewing court might
26   find that error occurred, habeas relief is not warranted where state court denial of claim
27   is "at least reasonable").
28   ///

-4-

1   In order to resolve Petitioner's claims, this Court will examine the explicated
2   decision of the California Court of Appeal or the Orange County Superior Court rather
3   than a subsequent one-line order from a reviewing state court, because "[w]here there has
4   been one reasoned state court judgment rejecting a federal claim, [federal habeas courts
5   should presume that] later unexplained orders upholding that judgment or rejecting the
6   same claim rest upon the same ground."   *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111
7   S. Ct. 2590, 115 L. Ed. 2d 706 (1991).

8
9                                        **III.**
10  Petitioner was tried along with two codefendants: Gerardo Luna and
11  Petitioner's older brother, Daniel Perez.  The California Court of Appeal found the
12  following facts underlying Petitioner's and his co-defendants' convictions:

13
14          Between 1:00 and 2:00 a.m. on December 21, 1999,
15          several residents of the Park Plaza Apartments in the City of
16          Garden Grove were awakened by gunshots . . . . The gunshots
17          were being fired in the direction of apartment 202, which was
18          being used as a "[s]afe house" by members of West Trece, a
19          criminal street gang . . . . After dialing 911, [a neighbor] looked
20          outside her balcony and saw a dark-colored pickup truck drive
21          in circles around the cul-de-sac in front of the apartment
22          complex and eventually exit onto Beach Boulevard.
23          A little after 2:00 a.m. on December 21, 1999, California
24          Highway Patrol Officers Patton and Erickson were traveling
25          southbound on Beach Boulevard in a marked patrol car. . . .
26          While waiting for [a] light to change . . . , they saw a green Ford
27          pickup truck travel northbound on Beach Boulevard and make
28

an illegal left turn on a red arrow. . . . The officers activated their overhead red light . . . and followed the truck. . . .

The truck accelerated . . . [and] turned, tires squealing, onto Santa Paula Avenue and then turned onto Santa Rita Street, where the officers lost sight of the truck for about three seconds. After the patrol car turned the corner, the officers saw the truck had jumped a curb and was stopped on the sidewalk. As Officer Patton started to get out of the patrol car, the truck slipped into reverse, backed off the curb, turned left onto Santa Monica Avenue, and stopped in front of a house.

[Co-defendant Gerardo] Luna, [co-defendant Daniel] Perez, and [Petitioner] were inside the truck. . . . Luna, Perez, and [Petitioner] were members of Crow Village, a criminal street gang in the City of Stanton. Crow Village and West Trece are enemy gangs.

Luna got out of the driver's side door of the truck. Officers Patton and Erickson got out of their patrol car with guns drawn and ordered Luna to lie on the ground and stay still. . . . Perez and [Petitioner] also got out of the truck. All three were bloodied and said they had been shot. . . .

. . . Erickson found three fully loaded magazines on the front seat. Defendants claimed they had no guns for the magazines.

Orange County Sheriff's Deputy Schulte . . . examined the truck and saw bullet holes on the driver's side and in the windshield. . . . Luna told Schulte that while he was driving northbound on Beach Boulevard, near Lampson Avenue,

someone drove by and fired shots into the truck. Perez told Schulte virtually the same thing. . . .

Meanwhile, other sheriff's deputies searched . . . [n]ear the intersection of Santa Rita Street and Santa Paula Avenue, [where they] found three guns . . . .

After the paramedics arrived and transported Luna and Perez to the hospital, Schulte spoke with [Petitioner], who had small cuts over his face consistent with an injury caused by glass fragments. [Petitioner] told Schulte someone started shooting at the truck as it passed the corner of Park Plaza and Beach Boulevard. [Petitioner] said he did not see the vehicle from which the gunshots came. When Schulte asked where the bullets might have come from if they did not come from a car, [Petitioner] replied he thought they came from the roof of a Home Depot store. [Petitioner] was searched and an unexpended bullet was found in the pocket of his jacket. At first he claimed the jacket belonged to his brother and he did not know about the bullet, but then he admitted the jacket was his. [Petitioner] denied knowing about the guns found in the street.

[Petitioner] was taken to the sheriff's substation in Stanton, where Orange County Sheriff's Investigator MacWillie interviewed him about 4:53 a.m. on December 21, 1999. At the time of the interview, [Petitioner] was not under arrest and was not considered a suspect. He agreed to speak with MacWillie, and the conversation was tape-recorded. [Petitioner] denied knowing of any weapons and told MacWillie the truck he was in was fired upon while traveling northbound on Beach

Boulevard.  Gunshot residue tests revealed . . . gunshot residue particles on [Petitioner's hand and gloves].

\* \* \*

About noon on December 21, by which time defendants had been placed under arrest, Perez and [Petitioner] were placed alone together in the backseat of a sheriff's patrol car that had been wired for sound recording.  During the course of their conversation, they admitted they had had possession of the guns and had thrown them from the truck.  They discussed leaving the area.  Perez stated, "I'm going to be doing a lot of time." [Petitioner] commented, "don't fucken [sic] take any time they give you, dog, until you go to trial."  [Petitioner] was removed from the patrol car . . . .

. . . In a planter at the Park Plaza Apartments, the deputies found expended casings from at least two different types of weapons.[FN]  At least 12 bullet strikes or fragments were found in or near apartment 202 . . . .

[FN] . . . [F]orensic tests as to the source of the fragments and casings were inconclusive . . . .

(Lodgment No. 12, at 2-7) (one footnote omitted, other in original.)

## IV.

Sheriff's deputies questioned Petitioner on the night of the incident intermittently over a three-plus hour period without advising Petitioner of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). (*See* RT 60-67, 71, 92-93, 96-98.)  Petitioner argues that the introduction at trial of his statements made during this police questioning violated his Fifth Amendment rights

1  pursuant to *Miranda*. (2005 First Amended Petition, at 5, att.) Petitioner raised this same

2  claim on direct appeal in state court; the California Court of Appeal assumed for purposes

3  of discussion that Petitioner's rights had been violated but found any error harmless

4  beyond a reasonable doubt. (Lodgment No. 12, at 30.)

5      In *Miranda*, the United States Supreme Court held that the Fifth Amendment

6  privilege against self-incrimination prohibits admitting against a defendant statements

7  made by him during custodial interrogation where the defendant was not advised of his

8  constitutional rights prior to police questioning. *Miranda*, 384 U.S. at 444. Custodial

9  interrogation is "questioning initiated by law enforcement officers after a person has been

10  taken into custody or otherwise deprived of his freedom of action in any significant way."

11  *Id*.  Whether a suspect is in custody for purposes of *Miranda* is an objective test

12  determined by the overall circumstances surrounding the interrogation and whether a

13  reasonable person in the suspect's situation would have felt free to terminate the

14  interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133

15  L. Ed. 2d 383 (1995); *see also Yarborough v. Alvarado*, 541 U.S. 652, 662-63, 124 S. Ct.

16  2140, 158 L. Ed. 2d 938 (2004). The term "interrogation" means "any words or actions

17  on the part of the police (other than those normally attendant to arrest and custody) that

18  the police should know are reasonably likely to elicit an incriminating response." *Rhode*

19  *Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). "The test is

20  an objective one; the subjective intent of the police is relevant, but not conclusive."

21  *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006).

22      The record discloses that fifteen year old Petitioner first was interviewed by

23  Deputy Schulte near 2:00 a.m. on December 21, 1999, and then transported to the police

24  station where he was detained by Deputy Schulte (with bags secured to his hands to

25  preserve them for gunshot residue testing) until 4:53 a.m., at which time he was

26  interviewed further by Sheriff's Investigator MacWillie in a room with a closed door.

27  (RT 60-67, 71-79, 92-93, 96-98, 716-21, 726-29.) At no time during this early morning

28  period was Petitioner read his *Miranda* rights; Deputy Schulte told Petitioner that he was

*not* free to leave until he gave a statement at the police station. (RT 77-78, 92-93, 96-98.) The questions posed to Petitioner focused not only on how Petitioner and his co-defendants were shot, but also on whether the three had themselves shot any weapons that night. (*See* RT 67, 220-24, pages foll. RT 665.[2]) Nevertheless, the officers characterized Petitioner as a "victim" or "witness" during this period, and, perhaps based on an apparent agreement with this assessment, the trial court allowed the introduction at trial of Petitioner's statements to police.[3] (*See* pages foll. RT 665, RT 666-68, 722.)

In the interviews at issue, Petitioner did not confess his guilt. Rather, he denied knowledge of the guns in the truck and of the bullet in his jacket pocket (which jacket he initially claimed was not his), and told police that the truck came under fire, maybe from a nearby rooftop, as it drove along Beach Boulevard. (*See e.g.* RT 183-84, 220-24, 725-29, pages foll. RT 665.) Perhaps the only expressly inculpatory statement made by Petitioner to police was his admission that the jacket he wore, and in which the bullet was found, did belong to him.[4] (*See* RT 220-24.) Aside from this statement, Petitioner's statements to police were inculpatory only insofar as they were shown to be lies and therefore could demonstrate consciousness of guilt.

The California Court of Appeal did not decide whether Petitioner's Fifth Amendment rights were violated by the introduction of his statements made to Deputy Schulte and Investigator MacWillie. (Lodgment No. 12, at 30.) Rather, it assumed a

---

[2] Included in these pages is the transcript of Officer MacWillie's interview with Petitioner.

[3] At 6:00 a.m., Petitioner was interviewed by Sheriff's deputies for a third time by Deputy Hoag who did inform Petitioner of his *Miranda* rights. (RT 139.) This Court's review of the record shows that the prosecution did not introduce any statements Petitioner made during this interview.

[4] Schulte testified that Petitioner made a "spontaneous statement" admitting ownership of the jacket. (RT 67.) If this statement was volunteered by Petitioner, then it would not be considered a product of interrogation, *see Rhode Island v. Innis*, 446 U.S. 291, 300-02, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (*Miranda* does not prohibit introduction of defendant's spontaneous statement not made in response to custodial interrogation), but that issue need not be addressed here. As explained below, the Court has assumed that the introduction of all of Petitioner's statements, including his admission of ownership of the jacket, was in violation of Petitioner's rights, and thus addresses the ultimate question of the harmfulness of the admission.

violation but found it harmless because Petitioner's statements to the sheriffs essentially were exculpatory and the other evidence of Petitioner's guilt was strong. (*Id.*) The assumption that a constitutional violation occurred is reasonable. *Miranda*, 384 U.S. at 444; *Innis*, 446 U.S. at 301.   Nevertheless, because the California Court of Appeal expressly found that any error was harmless, Petitioner can obtain habeas relief here only if both:   (1) the state court's harmless error determination was contrary to or an unreasonable application of Supreme Court precedent; *and* (2) this Court determines that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)), *cert. denied*, 547 U.S. 1059, 126 S. Ct. 1660, 164 L. Ed. 2d 403 (2006); *see also Mitchell v. Esparza*, 540 U.S. 12, 17-18, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (*per curiam*) ("[H]abeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner."); *see also Williams v. Stewart*, 441 F.3d 1030, 1051 (9th Cir.) (noting that *Miranda* violations are subject to harmless error review), *cert. denied*, __ U.S. __, 127 S. Ct. 510, 166 L. Ed. 2d 381 (2006).

Under the deferential AEDPA standard, the state court's determination that any error was harmless beyond a reasonable doubt is not objectively unreasonable. 28 U.S.C. § 2254(d).   Importantly, Petitioner's statements to the police generally were exculpatory.   The only possible exceptions were Petitioner's acknowledgment that he owned the jacket and his inferentially inculpatory lies to police. On the other hand, the evidence of Petitioner's guilt was weighty. Petitioner had gunshot residue on his hand and on the gloves he wore when apprehended by police. (RT 465-70, 703-05.) There was ammunition inside the truck and Petitioner had a bullet in his pocket. (RT 183, 210-11, 223-24, 281-83.) Three guns were found on the road where the truck fled from police and

///

///

///

two of the three were matched to cases found in co-defendant Luna's garage.[5] (RT 219, 325, 446-53.) Petitioner and his co-defendants were members of the Crow Village gang which was an enemy of the victims' gang. (RT 344-45, 526, 536-45, 560.) The shooters fired weapons multiple times into the apartment housing the victims' gang. (RT 248-51, 419-19, 488-93.) The truck in which the three were riding matched the description of the truck driven by the shooters at the apartment complex, and Petitioner and his brother Perez were at the complex just before the shooting took place. (RT 417-20, 829-30, 890.) Also compelling was Petitioner's conversation with his co-defendant brother, Daniel Perez, which was taped without their knowledge by police, and in which Petitioner admitted possessing one of the three guns found by police.  Following is a portion of that conversation:[6]

> Perez:  You know they tested that gun I gotten . . .
>
> [Petitioner]:  It's fucken stolen, dog, I swiped it . . . . [¶] What did they charge you with?  Fool gun?  Just one?
>
> Perez:  They're charging both of us with the guns, I guess.
>
> [Petitioner]:  I'm gonna deny my shit.  No, fuck that. What did you tell him?
>
> Perez:  Nothing.  [¶]  But what did they say about the gun?
>
> [Petitioner]:  That they got the .38.  They got the .38 with me.  Cause they just went and fucken dust off me and shit.
>
> Perez:  . . . Tec .9, . . . , for that shit out of state . . .

---

[5] In fact, a sheriff's deputy testified that co-defendant Luna admitted owning the three guns and that they had been thrown from his truck as the police pursued the defendants. (RT 314-16.) The jury was instructed, however, that this statement was admissible only as to Luna. (RT 312.)

[6] All errors in original.

[Petitioner]: And they said, blasted at the, I wasn't blastin nowhere, hey. I fucken . . . I didn't even blast. That . . . I, I don't know who's gloves were these and shit and I just put em on. I don't know how the dust got on em that way. I denied it, dog. I denied everything. I . . . denied even having a cueta [English translation gun], Dog, that . . .

Perez: Like they got you with one?

[Petitioner]: Uh-huh. .38. I'm goin to Y.A., dog. That's why I fuck that over, eh?

Perez: No. Fucken um, . . . the gun was fucken thrown. The hardware landed in the bush.

[Petitioner]: It was a fuck up to throw it. Might be chargin us both, dog. [¶] The only thing you could do now is move to T.J. . . . . It's better than doing five years, dog.

\* \* \*

[Petitioner]: . . . What kind of cueta did they have? Huh?

Perez: .22. .22.

[Petitioner]: The .38 was fucken loaded. Gang members around.

Perez: They found . . . they saw the .38 on you? You didn't throw it out?

[Petitioner]: Yeah. Dog, I threw it out.

Perez: And the other one was thrown, too.

[Petitioner]: Yeah. Um. My fucken dust prints, dog. They didn't take dust prints off you?

Perez: No. You know why? Cause you had the . . . cause you had the .38.

1   [Petitioner]: Oh. Fuck up hey. I had three more. I threw
2   em right here, hey. Under this car. . . . [¶] How did they know
3   you had the Tec .9? You're dumb. You admitted it, huh? You
4   didn't admit nothing? . . . [¶] Don't fucken take any time they
5   give you, dog, until you go to trial.

7   (RT 708-10.)
8   　　　In sum, the evidence apart from Petitioner's only marginally inculpatory
9   statements to police demonstrated Petitioner's motive to kill the victims (gang rivalry), a
10  plan to kill the victims (accompanying two other gang members with multiple guns to the
11  victims' apartment), the inherently deadly nature of Petitioner's actions (shooting, along
12  with co-defendants, at the victims' inhabited apartment), and Petitioner's consciousness
13  of guilt (fleeing from police and planning to "deny my shit"). *See e.g. People v. Smith*, 37
14  Cal. 4th 733, 741-42, 37 Cal. Rptr. 3d 163 (2005) (holding that "purposefully firing a
15  lethal weapon at another human being at close range, without legal excuse, generally gives
16  rise to an inference that the shooter acted with express malice," and noting also that
17  evidence of motive may be probative of intent to kill); *People v. Lashley*, 1 Cal. App.
18  4th 938, 945, 2 Cal. Rptr. 2d 629 (1991) (finding that the manner of the defendant's
19  shooting at the victim, while not at point-blank range, demonstrated intent to kill); *and cf.*
20  *People v. Bland*, 28 Cal. 4th 313, 329-31, 121 Cal. Rptr. 2d 546 (2002) (transferred intent
21  to kill shown by use of weapons aimed at inhabited places, creating a "kill zone").
22  　　　Given this evidence, the state courts' determination that any constitutional
23  error in the introduction of Petitioner's statements to police was harmless was not
24  objectively unreasonable. 28 U.S.C. § 2254(d); *Inthavong*, 420 F.3d at 1061-62; *see also*
25  *Sims v. Brown*, 425 F.3d 560, 571-72 (9th Cir. 2005) (finding error in introducing
26  defendant's confession harmless where there was other evidence that defendant had the
27  motive to kill and a plan to kill and where defendant's acts were so dangerous that they
28  were likely to result in the victim's death), *as amended*, 430 F.3d 1220, *cert. denied*, ___

- 14 -

1  U.S. __, 127 S. Ct. 62, 166 L. Ed. 2d 56 (2006); *Price*, 538 U.S. at 643 (even where
2  reviewing court might find that error occurred, habeas relief is not warranted where state
3  court denial of claim is "at least reasonable").

4  For these same reasons, any error in admitting Petitioner's statements to
5  police also did not have a "substantial and injurious effect or influence in determining the
6  jury's verdict." *Brecht*, 507 U.S. at 537.

## V.

9  Next, Petitioner argues that he should not have received a 20 year sentence
10 enhancement for discharging a firearm in the course of the conspiracy to commit murder
11 because the enhancement was inappropriate under state law. (2005 First Amended
12 Petition, at 5, att.; *see also* CT 875.) Specifically, he argues that the 20 year enhancement
13 pursuant to California Penal Code § 12022.53(c) for personally discharging a firearm may
14 not be applied to a 25-year-to-life sentence for conspiracy to commit murder because
15 § 12022.53(j) prohibits the application of the subsection (c) enhancement when other
16 provisions of law provide for a greater punishment. (*See* 2005 First Amended Petition,
17 att.) The California Court of Appeal rejected Petitioner's argument as a matter of state
18 law. The appellate court found that "[t]he Legislature did not intend the unprecedented
19 step of making the firearm discharge enhancement inapplicable when it is shorter than the
20 base term for the underlying crime." (Lodgment No. 12, at 39-43.) The California
21 Supreme Court has agreed with this decision and settled this statutory interpretation
22 question: subsection (j) does not preclude application of an enhancement under this
23 section where the base term is lengthier than the enhancement. *See People v. Shabazz*, 38
24 Cal. 4th 55, 40 Cal. Rptr. 3d 750 (2006).

25 Petitioner contends here only in a cursory manner that his constitutional right
26 to due process was violated. (2005 First Amended Petition, at 5, att.) Although he does
27 mention "due process" once, his only explicated claim to this Court is that the sentence
28 violated state statutory law. (*See also* Traverse, at 2-4.) A challenge to a state court's

interpretation of a state law issue is not a proper basis for habeas relief.  28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) ("We accept a state court's interpretation of state law, and alleged errors in the application of state law are not cognizable in federal habeas [and a petitioner cannot] transform a state-law issue into a federal one merely by asserting a violation of due process."); *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law."); *Hubbart v. Knapp*, 379 F.3d 883, 779-80 (9th Cir. 2004) ("We may not second-guess the California appellate court's construction of its own state law unless it appears that its interpretation is an obvious subterfuge to evade consideration of a federal issue.") (quotation omitted), *cert. denied*, 543 U.S. 1071, 125 S. Ct. 913, 160 L. Ed. 2d 807 (2005).

The state courts reasonably rejected Petitioner's state law claim on state law grounds; Petitioner is not entitled to federal habeas relief.  28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68.

## VI.

Petitioner's third claim is that the trial court violated his due process rights when it did not instruct the jury on lesser included offenses. In his petition, Petitioner does not specify which lesser included offenses should have been offered to the jury as alternatives; he complains only generally that no lesser included offenses were presented. (2005 First Amended Petition, at 6, att.)  Such a generalized and vague claim cannot warrant habeas relief. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).  If this Court is to consider the clarification in the Traverse, then Petitioner's claim is that the jury should have been instructed on attempted voluntary manslaughter and aggravated assault as lesser included offenses to attempted murder. (Traverse, at 4-6.)  Petitioner argues that these

///

///

///

instructions would have been appropriate because the jury could have found substantial evidence that he acted without malice or without an intent to kill.[7] (*Id.*)

In discussing jury instructions near the close of Petitioner's trial, Petitioner's attorney informed the trial court that he was not requesting any instructions on lesser included offenses. (RT 645-48, *see also* RT 776-78.) Later, the trial court clarified with counsel that the defense truly desired to waive instructions on lesser offenses; Petitioner's attorney answered this was the defense's tactical choice. (RT 776-78.) Thus, the court did not instruct the jury on lesser included offenses to attempted murder. The California Court of Appeal found that any error in the failure to instruct on lesser included offenses was invited by the defense when it expressly chose an "all or nothing" trial strategy. (Lodgment No. 12, at 30-33.) Thus under the state "invited error" procedural doctrine, the court refused to consider the merits of Petitioner's claim. (*Id.*)

Although Respondent initially did not argue that this claim is procedurally defaulted, it appeared to this Court that the claim likely was defaulted under California's invited error rule. *See Leavitt v. Arave*, 383 F.3d 809, 832-33 (9th Cir. 2004) (invited error may be an adequate and independent basis for state denial and should be treated as any other potential state procedural default), *cert. denied*, 545 U.S. 1105, 125 S. Ct. 2540, 162

---

[7]    Under California law, murder is the unlawful killing of a human being with malice aforethought. CAL. PENAL CODE § 187. One who commits an unlawful and intentional killing without malice is guilty of the lesser crime of voluntary manslaughter only where he kills upon a sudden quarrel or heat of passion or where he kills in unreasonable self-defense. *See People v. Barton*, 12 Cal. 4th 186, 199, 47 Cal. Rptr. 2d 569 (1995). Attempted voluntary manslaughter occurs where one intends to kill, but does not kill, either in the heat of passion or in unreasonable self-defense. *See People v. Montes*, 112 Cal. App. 4th 1543, 1549-52, 5 Cal. Rptr. 3d 800 (2003) (attempted voluntary manslaughter requires intent to kill).
     Aggravated assault occurs when one "commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury." CAL. PENAL CODE § 245(a)(1). Assault is a general intent crime, meaning that the defendant need only intend to commit the acts, not any particular result. *See People v. Colantuono*, 7 Cal. 4th 206, 214-15, 26 Cal. Rptr. 2d 908 (1994).
     Contrary to Petitioner's claim, it appears that assault under section 245(a)(1) is not a lesser included offense to attempted murder, *see People v. Parks*, 118 Cal. App. 4th 1, 6, 12 Cal. Rptr. 3d 635 (2004), and that Petitioner therefore would not have been entitled to instruction on assault as a lesser *related* offense. *People v. Birks*, 19 Cal. 4th 108, 136-37, 77 Cal. Rptr. 2d 848 (1998).

1   L. Ed. 2d 277 (2005); *see also People v. Wader*, 5 Cal. 4th 610, 657-58, 20 Cal. Rptr. 2d

2   788 (1993) ("When a defense attorney makes a 'conscious, deliberate tactical choice' to

3   forego a particular instruction, the invited error doctrine bars an argument on appeal that

4   the instruction was omitted in error.") (citation omitted).  The Court ordered, in the

5   interests of comity, federalism, and judicial efficiency, that Petitioner show why the claim

6   should not be denied as defaulted. *Boyd v. Thompson*, 147 F.3d 1124, 1127-28 (9th Cir.

7   1998) (so long as petitioner is given an opportunity to respond to default argument, court

8   has discretion to raise *sua sponte* state procedural default defense where doing so will

9   further the interests of comity, federalism, and judicial efficiency).

10             As the Court explained in an order to show cause to Petitioner, in order for

11   the Court of Appeal's procedural denial to bar federal review, the invited error rule must

12   constitute an "adequate and independent state ground" for denying Petitioner's claims.

13   *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

14   "For a state procedural rule to be 'independent,' the state law basis for the decision must

15   not be interwoven with federal law." *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir.

16   2001).  To be "adequate," the state procedural rule "must [have] be[en] well-established

17   and consistently applied" at the time it was applied by the state court. *Bennett v. Mueller*,

18   322 F.3d 573, 583 (9th Cir. 2003).

19             In *Bennett*, the Ninth Circuit explained that once a petitioner is alerted to a

20   potential procedural default based on an allegedly adequate and independent state rule,

22          the burden to place that defense in issue shifts to the petitioner.

23          The petitioner may satisfy this burden by asserting specific

24          ~~factual allegations that demonstrate the inadequacy of the state~~

25          procedure, including citation to authority demonstrating

26          inconsistent application of the rule.  Once having done so,

however, the ultimate burden of proving the adequacy of the California state bar is upon the State of California.

*Bennett*, 322 F.3d at 586.

Petitioner argues that the invited error rule was not applicable in his case because the record does not show his attorney made a tactical decision not to request the instructions. (*See* Traverse, at 4-6.) But Counsel answered that his decision was tactical and the California Court of Appeal, after considering the applicable authority – which does require that an attorney made a tactical decision in order for the invited error doctrine to apply – made a factual finding that Petitioner's attorney made such a strategic choice. (*See* RT 645-48, 776-78; Lodgment No. 12, at 30-33 (discussing cases).) Petitioner does not show that the invited error bar is not adequate either in general or under the facts of his case. *Bennett*, 322 F.3d at 586.

Petitioner defaulted his third claim in state court as an invited error when his attorney chose to have the trial court *not* instruct the jury on any lesser included offenses. *Leavitt*, 383 F.3d at 832-33; *Bennett*, 322 F.3d at 586.

As the Court explained to Petitioner, he may avoid this default only by demonstrating either "cause and prejudice or actual innocence." *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994); *see also Coleman*, 501 U.S. at 750; *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977). Petitioner argues that his attorney performed deficiently when he chose not to request the instructions, and therefore alleges that cause and prejudice should excuse his default. (*See* Response to Order to Show Cause, at 5.)

Attorney error that rises to the level of ineffective assistance of counsel may constitute cause to excuse a procedural default. *McCleskey v. Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991). Where a petitioner establishes the elements of an ineffective assistance of counsel claim, he normally will meet the cause and prejudice test. *United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir. 1996).

To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient, and that the deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Petitioner bears the burden of establishing both components. *Id.* Deficient performance is performance which is objectively unreasonable under prevailing professional norms. *Id.*, 466 U.S. at 687-88. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Bell*, 535 U.S. at 702. Under *Strickland*, counsel's deficient performance prejudices a petitioner where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Claims of ineffective representation by counsel alleged as cause for defaulted claims must themselves be exhausted in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 451-52, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000); *Cockett v. Ray*, 333 F.3d 938, 943 (9th Cir. 2003) (same). Petitioner *did* exhaust this ineffective assistance claim in the state courts. (*See* Lodgment No. 14, at 17-18, and Section VII below.) Although it is clear that Petitioner must have exhausted his ineffective assistance claim to assert it as cause for his default, it is not so clear whether the state court's denial of that independently exhausted claim is entitled to deference under AEDPA. It would seem logical, given that the state courts must have had an opportunity to consider the claim, that this Court would be required under AEDPA to accord the state court opinion deference – why would the Court require presentation of the claim to the state courts and then disregard the state court's determination of the claim? Neither the Supreme Court nor the Ninth Circuit has so held, however. ~~And in fact, the Third and Sixth Circuits expressly have held to the contrary.~~ Both have decided that a federal court reviewing an ineffective assistance of counsel claim alleged as cause to excuse default owe no deference to the state court's decision on the same claim. *See Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006) ("Although [petitioner] must satisfy the AEDPA standard with respect to his independent IAC claim,

he need not do so to claim ineffective assistance for the purpose of establishing cause."), *cert. denied*, __ U.S. __, 127 S. Ct. 1827, 167 L. Ed. 2d 321 (2007); *Fischetti v. Johnson*, 384 F.3d 140, 154-55 (3d Cir. 2004) (holding that violation of constitutional right to counsel constituted cause excusing default but did not warrant habeas relief under AEDPA deferential standard of review). The Seventh and Eighth circuits have declined to decide the issue. *See Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003); *Clemons v. Luebbers*, 381 F.3d 744, 752 n.4 (8th Cir. 2004), *cert. denied*, 546 U.S. 828, 126 S. Ct. 41, 163 L. Ed. 2d 75 (2005). District courts have come to differing conclusions. *See e.g. Lee*, 328 F.3d at 901 (comparing cases); *Orbe v. True*, 233 F. Supp. 2d 749, 760 (E.D. Va. 2002) (requiring deference to state court decision on exhausted ineffective assistance of counsel claim); *Holland v. Horn*, 150 F. Supp. 2d 706, 747 (E.D. Pa. 2001) (no deference required); *Torrefranca v. Schriro*, 2006 WL 1981788, *10 n.5 (D. Ariz. 2006) (Report and Recommendation of Magistrate Judge holding no deference required), *adopted by District Court*, 2007 WL 163100 (D. Ariz. Jan. 18, 2007).

Ultimately, this Court need not decide the issue, for whether the Court reviews the state court determination deferentially or *de novo*, Petitioner has not demonstrated that his attorney was ineffective in this regard.

The state court determined that counsel made a reasoned tactical decision not to request instructions on any lesser offenses, as follows:

> The record demonstrates there was a rational tactical purpose for defense counsel's invitation to the trial court to not instruct on lesser included offenses. Defense counsel wanted to avoid arguing inconsistent defenses, wanted to avoid a compromise verdict, and wanted to force the prosecution to prove intent to kill. Defense counsel made a deliberate choice to use an "all-or-nothing" tactical strategy rather than risk a compromise verdict.

(Lodgment No. 12, at 33) (citation omitted.) As noted above, the record demonstrates that counsel's decision was tactical. (*See* RT 645-48, 776-78.) As the Supreme Court has instructed, "strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91.

The California Court of Appeal found that counsel's strategy was rational because it avoided inconsistent defenses or a compromise verdict and forced the prosecution to prove intent to kill.[8] Such a tactic, although not the only one available to counsel, was not so unreasonable as to constitute ineffective assistance of counsel. *See Butcher v. Marquez*, 758 F.2d 373, 376-77 (9th Cir. 1985) (defense counsel reasonably chose not to request lesser offense instructions which were inconsistent with trial defense); *and compare United States v. Span*, 75 F.3d 1383, 1389-90 (9th Cir. 1996) (finding attorney ineffective where his misunderstanding of the law was the reason he failed to request instruction for only defense supported by evidence). Although one might disagree with counsel's strategy, Petitioner does not show that counsel's choice was made after anything other than a full understanding and investigation of the law and facts of Petitioner's case, making his tactical choice "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91.

Viewing the totality of the record, which, despite containing evidence from which a jury could have inferred Petitioner's intent to kill, also included a lack of evidence over exactly what transpired as the two warring gangs fired at each other, and perhaps given Petitioner's youth which counsel might have hoped would win sympathy from the jurors, counsel's strategic choice to force the prosecution to prove that Petitioner acted with malice was not so far afield as to be outside the "wide-range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Counsel's options likely all appeared unappealing at the time, and counsel chose to force the prosecution to prove malice in

---

[8] This is not entirely correct because, as noted above, *attempted* voluntary manslaughter requires an intent to kill.

order to convict him. Second-guessing an attorney's tactical choices with the benefit of hindsight should not be a basis on which to find counsel ineffective. *Strickland*, 466 U.S. at 689 (attorney's actions must be considered "from counsel's perspective at the time," and "every effort [must] be made to eliminate the distorting effects of hindsight"); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995) ("The Sixth Amendment does not hold an attorney responsible for the difficulty of the case he inherits."); *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) ("Under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill.").

In any event, Petitioner also cannot demonstrate prejudice from counsel's actions in this regard; he cannot show that there is a reasonable probability that he would have achieved a better result had counsel requested instructions on attempted voluntary manslaughter or aggravated assault. Having found Petitioner guilty of attempted premeditated murder, the jury necessarily found premeditation and malice. This result is not surprising; Petitioner had a motive and plan to kill the victims, his actions were inherently deadly in nature, and he exhibited a consciousness of guilt. Thus, even though the jury asked a question regarding malice (*see* Section X below), it necessarily found that Petitioner actually premeditated the attempted murders. Thus, Petitioner has not shown that it is reasonably likely that the jury would have convicted him either of attempted voluntary manslaughter or aggravated assault. *Strickland*, 466 U.S. 687; *see also People v. Horning*, 34 Cal. 4th 871, 906, 22 Cal. Rptr. 3d 305 (2004) (finding harmless any error in failing to give lesser included offense instructions where jury verdict demonstrated that jury would not have found defendant guilty of a lesser offense), *cert. denied*, 546 U.S. 829, 126 S. Ct. 45, 163 L. Ed. 2d 77 (2005).

Even reviewing the ineffective assistance of counsel claim *de novo*, Petitioner has not overcome the strong presumption that his attorney's conduct was within the wide range of reasonable professional assistance and has not shown that he suffered prejudice from counsel's actions. *Bell*, 535 U.S. at 702; *Strickland*, 466 U.S. 687. It follows then that Petitioner has not shown cause for the default of his underlying constitutional claim

1  and this Court may not review the claim on habeas. *McCleskey*, 499 U.S. at 494. Claim

2  number three should be denied as defaulted.[9]

## VII.

In his fourth claim, Petitioner presents the ineffective assistance claim discussed immediately above: that counsel was ineffective in waiving instruction on lesser included offenses. (2005 First Amended Petition, at 6, att.) There is no question but that when presented with this ineffective assistance of counsel claim as a substantive claim for relief, the Court must review it pursuant to the deferential AEDPA standard of review. As explained above, this claim fails even under *de novo* review, and therefore fails under deferential AEDPA review. 28 U.S.C. § 2254(d); *Yarborough v. Gentry*, 540 U.S. at 6 (judicial review of an attorney's performance is "doubly deferential when it is conducted through the lens of federal habeas").

## VIII.

Next, Petitioner contends that his sentence of 45 years to life in state prison constitutes cruel and unusual punishment. (2005 First Amended Petition, at 6, att.) In non-capital cases, the Eighth Amendment prohibits only extreme sentences that are "grossly disproportionate" to the severity of the crime. *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring); *Andrade*,

---

[9]  Claim number three, were it to be considered on its merits, would fare no better – even when reviewed *de novo* due to the fact that the state courts did not consider its merits. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002). There is no Supreme Court authority holding that a defendant in a non-capital case is entitled constitutionally to instructions on lesser included offenses. *Beck v. Alabama*, 447 U.S. 625, 638 n.14, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980); *Windham v. Merkle*, 163 F.3d 1092, 1105-1106 (9th Cir. 1998); *cf. also Howell v. Mississippi*, 543 U.S. 440, 445, 125 S. Ct. 856, 160 L. Ed. 2d 873 (2005) (suggesting *Beck* does not apply in non-capital cases). Therefore, Petitioner is not entitled to habeas relief on this claim. 28 U.S.C. § 2254(d); *but cf. Solis v. Garcia*, 219 F.3d 922, 929-30 (9th Cir. 2000) (holding that a defendant may be entitled to lesser included offense instructions if those instructions encompass the defendant's theory of defense and are supported by substantial evidence); *questioned by Chaidez v. Knowles*, 258 F. Supp. 2d 1069, 1096 n.15 (N.D. Cal. 2003) (suggesting there is not clearly established Supreme Court authority for *Solis* proposition).

538 U.S. at 72 ("A gross disproportionality principle is applicable to sentences for terms of years."). As a result, "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980); *see also Andrade*, 538 U.S. at 77 ("The gross disproportionality principle reserves a constitutional violation for only the extraordinary case.").

Considering the gravity of the many violent offenses of which Petitioner was convicted, which included conspiracy to commit murder, attempted murder, and discharging a firearm in the course of these felonies, it was not objectively unreasonable for the California courts to "conclude that [the imprecise] contours [of the proportionality principle] permitted an affirmance" of Petitioner's sentence. *See United States v. Fernandez*, 388 F.3d 1199, 1258 (9th Cir. 2004) (life sentence for RICO violation predicated on finding that defendant committed conspiracy to commit murder is not cruel and unusual punishment), *as amended*, 425 F.3d 1248, *cert. denied*, 544 U.S. 1043, 125 S. Ct. 2286, 161 L. Ed. 2d 1077 (2005); *United States v. Parker*, 241 F.3d 1114, 1117-18 (9th Cir. 2001) (upholding lengthy sentence for crime committed with use of firearm); *see also Harmelin*, 501 U.S. 957 (upholding life imprisonment for first offense drug conviction); *Andrade*, 538 U.S. 63 (denying habeas claim of cruel and unusual punishment for a sentence of 50 years to life for shoplifting $150 worth of videotapes in light of defendant's prior record); *Rummel*, 445 U.S. 263 (upholding life sentence imposed after third nonviolent felony conviction).

## IX.

Petitioner's sixth claim is that the court allowed improper expert testimony on the ultimate issue of his intent to kill. (2005 First Amended Petition, att.) At trial, Orange County Sheriff's Deputy Brian Irish testified as a gang expert regarding the shooting between the two gangs. (*See* RT 525-85.) The California Court of Appeal accurately described the relevant portion of Deputy Irish's testimony as follows:

When Irish testified as an expert on criminal street gangs, the prosecution asked him a series of questions based on hypothetical facts that were virtually identical to the facts of this case . . . .

The first portion [of his testimony] reads: "Q [Prosecutor] . . . In my hypothetical question, there were three gang members from gang A. . . . If they plan to go do a drive-by and arm themselves as they were armed, would those gang members know, if they're in the car . . . that their gang commits one or more of the dirty 25 [crimes forming the basis for the street gang enhancement] as one of its primary purposes? [¶] . . . [¶] [Perez's counsel]: Objection, move as speculative, legal conclusion, your honor. [¶] The Court: I'm going to permit him to answer subject to a motion to strike. [¶] [Irish]: Based on the information in the hypothetical question, with the guns and the rival gang information, I would – it would be my opinion there that all three people in that car knew what they were going to do."

The second portion reads: "Q [Prosecutor] Based on my hypothetical, would you have an opinion as to whether or not those gang members are setting out to do a drive-by or whether or not they just got ambushed? [¶] A [Irish] My opinion is they went there to do a drive-by at least. [¶] Q And tell the jury what you base that opinion on. [¶] A Well, you have three people in a vehicle armed to the hilt with these types of weapons that he described in the hypothetical question at 2:00 in the morning going to a place that's right outside their traditional gang neighborhood, within a couple hundred, three hundred

yards and with a small demographic, they're going to shoot and try and kill gang B based on gang B's location, and the flaunting of their existence."

The third portion reads: "Q [Prosecutor] Let me change the hypothetical a little bit and add a couple more facts. [¶] Let's say later on gang member number one from gang A was interviewed and spoken with and he said that . . . the guns . . . in the car are his but the reason they were in the car is because he was going to go out practice target shooting later on that morning. [¶] Would you find that a viable alternative to your perspective that it was a drive-by shooting? [¶] A [Irish] Based on my experience and the information in the hypothetical question, I would think that would be a lie. [¶] Q Why is that? [¶] A It doesn't make any sense."

During cross-examination, Perez's counsel altered the hypothetical to be consistent with defendants' theory of self-defense. Before counsel asked a question based on the altered hypothetical, the court interrupted and, outside the jury's presence, said: "During the last break, I had called counsel into chambers to caution the D.A. that he could not put a hypothetical to this expert concerning the credibility of a particular person or defendant. [¶] And then I also cautioned the district attorney not to put the witness in a position where he's commenting on the intent of the participants during these shootings. [¶] And I thought the district attorney understood because he didn't ask any more questions. [¶] But apparently from what I'm hearing from [Perez's counsel] right now, he wasn't listening to what I was telling [the district attorney]. [¶]

So it appears to me what you're structuring is something about your client's statements concerning his involvement in this alleged crime, and you're going to ask the witness about the credibility of those statements. [¶] And I'm concerned that that is impermissible. So that's why I interrupted. [¶] . . . And that one question the district attorney asked was not objected to by any party, so it's standing there. But I'm not going to let the D.A. argue that." . . .

In his closing argument, the prosecutor mentioned Irish's testimony that "gang members shoot to kill." After the prosecutor finished his closing argument, the court stated, "I know that the appellate courts are allowing greater latitude as to the opinion of the gang expert in testifying, but I don't think they yet have allowed the gang expert to voice an opinion as to the intent of the accused at the time of the shooting." One of the prosecutor's comments, the court stated, was "right on the threshold of that area." The court asked the prosecutor to return the next morning either with case authority permitting an expert to opine on intent or with an admonition to the jury that the prosecutor made a misstatement.

The prosecutor did not provide such case authority. The court did not admonish the jury. Rather, the prosecutor stated during rebuttal argument: "[Y]esterday there was some mention about Deputy Irish's testimony which was unobjected to and is part of the record that you can consider that gang members, when they shoot, shoot to kill, not to wound. [¶] I just want to remind you that ultimately the final decision of whether these three defendants were shooting to kill is an issue of fact to be

1    decided by you.  You can weigh and evaluate expert opinion on

2    all the other testimony you've received, but that's a fact for the

3    trier of fact, which is you in this case."

4

5    (Lodgment No. 12, at 20-22; *see also* RT 560-71, 620-24, 966, 1006-07, 1059-60.)

6    The California Court of Appeal found that Petitioner waived any challenge

7    to Irish's testimony by failing to object to it at trial.  (Lodgment No. 12, at 22-23.)

8    Respondent contends that the state contemporaneous objection rule constitutes an

9    independent and adequate state procedural default precluding federal review.  As noted

10   above, in order for a state court denial based on a procedural rule to bar federal review, the

11   state rule must constitute an "adequate and independent state ground" for denying

12   Petitioner's claims.  *Coleman*, 501 U.S. at 729; *Bennett*, 322 F.3d at 583.

13   Respondent sufficiently pleaded the adequacy and independence of the

14   contemporaneous objection rule.  *Bennett*, 322 F.3d at 586.  Thus, Petitioner bore the

15   burden to "place the defense in issue." *Id.*  Petitioner did not meet his burden with respect

16   to this claim because he offered nothing in response to Respondent's allegation in this

17   respect, much less any specific factual allegations demonstrating inconsistent application

18   of the contemporaneous objection rule.  Therefore, this claim is defaulted.  *Id.; see also*

19   *Melendez v. Pliler*, 288 F.3d 1120, 1124-25 (9th Cir. 2002) (noting that California's

20   contemporaneous objection rule is adequate to sustain a default where a defendant makes

21   *no* objection at trial).

22   Petitioner attempts to avoid this default by asserting that counsel was

23   ineffective for failing to object to the testimony.  (Traverse, at 8-9); *see also Wainwright*,

24   433 U.S. at 87; *McCleskey*, 499 U.S. at 494; *McMullen*, 98 F.3d at 1157.  The California

25   Court of Appeal addressed the merits of Petitioner's ineffective assistance of counsel claim

26   when he raised it on direct appeal.  It found that defense counsel need not or could not

27   have objected successfully to the first portion of Deputy Irish's testimony wherein he

28   testified concerning gang members' knowledge of gang purposes and activities.

- 29 -

1   (Lodgment No. 12, at 24.) It further found (or at least suggested strongly), however, that

2   counsel was deficient in failing to object to Irish's answers in the second and third portions

3   of his testimony wherein he opined that three gang members, in the exact circumstances

4   of Petitioner and his co-defendants, would have had the intent to kill, and that Luna was

5   lying when he said he had the guns in the car to go target shooting the next day. (*Id.*, at

6   24-26.)

7          This Court will assume for purposes of argument that there was no reason to

8   fail to object to Deputy Irish's testimony and that an objection would have been successful.

9   *See People v. Killebrew*, 103 Cal. App. 4th 644, 651-59, 126 Cal. Rptr. 2d 876 (2002)

10  (discussing the admissibility of an officer's opinion testimony with respect to gang

11  member's intent). The remaining question then, is whether Petitioner has demonstrated

12  prejudice from that failure.

13          Again, whether reviewing the ineffective assistance of counsel claim *de novo*

14  or with AEDPA deference, Petitioner's argument is not persuasive. He has not

15  demonstrated that he was prejudiced by counsel's failure to object to the testimony. As

16  explained previously, in addition to Deputy Irish's testimony, the evidence that Petitioner

17  had the intent to kill included the fact that Petitioner and his co-defendants shot multiple

18  rounds from three weapons into an inhabited apartment unit housing rival gang members.

19  Further damaging to Petitioner's defense were his inculpatory conversation with his

20  brother and his lies to police. There is not a reasonable probability that had the jury not

21  heard Deputy Irish's testimony, Petitioner would have received a better result at trial.

22  *Strickland*, 466 U.S. at 694.

23          Because Petitioner has not demonstrated prejudice resulting from a failure by

24  his attorney in this regard, his claim that the testimony was introduced in violation of his

25  ///

26  ///

27  ///

28  ///

constitutional rights is procedurally defaulted and may not be considered by this Court.[10] *Coleman*, 501 U.S. at 729; *McMullen*, 98 F.3d at 1157.

## X.

Petitioner's final claim in the 2005 First Amended Petition is that his constitutional rights were violated when the trial court, in response to a note from the jury asking, "Please give us some examples of 'Malice Aforethought,'" answered with the following:

> Express malice aforethought involves a factual finding by the jury that at the time of the alleged shooting the defendant's state of mind was one where the defendant intended to kill another person. [¶] Penal Code section 188 states "it is express malice when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature."

(*See* CT 520-21; Lodgment No. 12, at 34-35.) Petitioner contends this was an "inadequate response" to the jury's question. (2005 First Amended Petition, att.)

The California Court of Appeal found this claim waived because there was no record that counsel objected to the court's response to the jury. (Lodgment No. 12, at 35.) Respondent argues that this is a procedural bar which precludes review of the claim in this Court.   It is not clear to this Court, however, that California requires contemporaneous objections to jury instructions at trial. *See* CAL. PENAL CODE § 1259

---

[10] Reviewed on its merits, this claim fails under the same analysis: the introduction of the officer's testimony was not so prejudicial as to render the trial fundamentally unfair. *See Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (holding that in order to demonstrate a due process violation, a defendant must show that "the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair"); *Dubria v. Smith*, 224 F.3d 995, 1002 (1995) (noting that the court must "examine [an] officer['s] statements in context to determine whether they fundamentally affect the fairness of the trial.").

("The appellate court may . . . review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."). For this reason, the Court has considered the merits of this claim (which also were considered and rejected by the California Court of Appeal). (*See* Lodgment No. 12, at 35.)

The trial court initially instructed the jury on malice aforethought as follows:

Malice is express when there is manifested an intention unlawfully to kill a human being.

When it is shown that a killing resulted from the intentional doing of an act with express [*sic*], no other mental state need be shown to establish the mental state of malice aforethought.

The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

The word "aforethought" does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act.

(CT 582; RT 1118.) As noted, the court answered the jury's question by restating in two sentences that express malice aforethought is shown when a defendant intended to kill another person. (CT 521.) The jury did not request any further clarification over the following two days of deliberation. (*See* CT 530-31, 538-39, 756.)

The supplemental instruction given to the jury was no more than a restatement, in slightly varied words but with no changed meaning, of the correct jury instruction given earlier to the jury. Moreover, the court's answer likely clarified any ambiguity left by the omission of the word "malice" in the second paragraph of the original instruction. The California Court of Appeal reasonably concluded (*see* Lodgment

- 32 -

No. 12, at 34-35), that this was sufficient to safeguard Petitioner's constitutional rights, especially given that the jury did not seek further clarification during its ongoing deliberations. *Weeks v. Angelone*, 528 U.S. 225, 234-36, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000); *Arizona v. Johnson*, 351 F.3d 988, 993-98 (9th Cir. 2003).

## XI.

In the 2007 Petition, Petitioner challenges the fairness of the juvenile court proceedings which preceded his criminal trial discussed above. (As noted, Petitioner was fifteen when the crimes were committed.) On March 7, 2000, Petitioner was found unfit to be tried as a juvenile. (Lodgment No. 21, Appendix, at 4-6.) Petitioner argues that this finding should be set aside because his attorney provided ineffective assistance of counsel at the juvenile proceedings and because the juvenile court judge did not consider factors suggesting Petitioner was amenable to be tried as a juvenile. (2007 Petition, at 5, att.)

Respondent argues that the claims are untimely because they accrued in 2000, when Petitioner was determined not to be fit for juvenile treatment. The Court will presume, however, that under 28 U.S.C. § 2244 the earliest date upon which these claims could accrue would be the date that Petitioner's conviction became final.[11] The juvenile

---

[11] AEDPA provides in relevant part:

(d)(1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of --
(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review;
(B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2)    The time during which a properly filed application for State post-conviction

(continued...)

- 33 -

1   court proceedings were part of Petitioner's criminal proceedings; the claims related to

2   these proceedings likely would have accrued no sooner than any other constitutional

3   claims regarding the fairness of Petitioner's criminal proceedings.[12]

4          Under this presumption, Petitioner's claims concerning his juvenile court

5   proceedings accrued when his conviction became final – on January 24, 2005 – when the

6   United States Supreme Court denied his petition for certiorari. *Bowen v. Roe*, 188 F.3d

7   1157, 1158-59 (9th Cir. 1999); 28 U.S.C. § 2244(d)(1)(A). From that date, Petitioner had

8   one year in which to file a habeas petition in this Court. *Patterson v. Stewart*, 251 F.3d

9   1243, 1246 (9th Cir. 2001). Instead, on February 3, 2005, Petitioner signed and mailed to

10  the Orange County Superior Court a petition for writ of habeas corpus challenging his

11  juvenile court proceedings. (Lodgment No. 17, at 6.) (The Court will use the February 3

12  mailing date as the filing date for this petition under the mailbox rule of *Houston v. Lack*,

13  487 U.S. 266, 108 S. Ct. 2379, 101 L. Ed. 2d 245 (1988) ("mailbox rule" applies to pro se

14  prisoners). *See also Jenkins v. Johnson*, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003) (signing

15  date is earliest possible "filing" date pursuant to mailbox rule).)

16         From this date, the statutory period was tolled continuously pursuant to

17  28 U.S.C. § 2254(d)(2) and *Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999), until

18  May 17, 2006, when the California Supreme Court denied Petitioner's final state court

19  habeas petition. (*See* Response to 2007 Petition, Exh. 2.) From that date, it was almost

20  a year to the date that Petitioner filed (by signing and mailing) the 2007 Petition in this

21  Court; Petitioner signed and mailed the 2007 Petition on May 16, 2007. (*See* 2007

22  Petition, at 8.) (The 2007 Petition was stamped filed in this Court on June 15, 2007.)

---

[11](...continued)
    or other collateral review with respect to the pertinent judgment or claim is pending shall
    not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

[12] Respondent's argument that Petitioner is not "in custody" as a result of his juvenile proceedings fails for the same reason: the juvenile proceedings were part of the state court proceedings leading to Petitioner's current incarceration.

Under this timeline, Petitioner missed the one-year statutory deadline by a matter of days: nine days elapsed from the date his conviction became final to the date he filed his first habeas petition (January 24 to February 3, 2005) and then Petitioner delayed almost an entire year after May 17, 2006, when he was no longer entitled to tolling under section 2244, until May 16, 2007, when he filed the 2007 Petition in this Court. (The pendency of Petitioner's habeas proceeding initiated in this Court in 2005 did not toll the statute of limitations. *Duncan v. Walker*, 533 U.S. 167, 181-82, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001).) Therefore, the 2007 Petition appears untimely.

Further, the 2007 Petition does not "relate back" to the filing date of the 2005 action in this Court because the claims concerning the juvenile proceedings raised in Petitioner's 2007 petition are based on different facts and law from those raised in Petitioner's 2005 petition and 2005 First Amended Petition, which concern the subsequent criminal proceedings. *Felix v. Mayle*, 545 U.S. 644, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) (holding that under Federal Rule of Civil Procedure 15(c), habeas claims do not relate back to earlier habeas petition filing date unless they arise from same set of operative facts as claims raised in previous petition).

Finally, any argument that Petitioner is entitled to equitable tolling of the AEDPA statute of limitations would be successful only if Petitioner could "'establish two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way.'" *Bryant v. Schriro*, 499 F.3d 1056, 1061 (9th Cir. 2007) (quoting *Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006)); *see also Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002) ("Petitioner bears the burden of showing that equitable tolling applies to his case."). A petitioner must demonstrate that an extraordinary, external impediment, and not his own lack of diligence, was the cause of his untimeliness. *Bryant*, 499 F.3d at 1061.

Petitioner does not appear to suggest that he is entitled to equitable tolling for any portion of the nine or 364 day periods, but one possibility is suggested by the record. In his habeas petition filed February 3, 2005 in the Orange County Superior Court,

Petitioner stated that his petition for writ of certiorari was "still pending" in the Supreme Court, when in fact it had been denied days prior. (*See* Lodgment No. 17, at 6.) In theory, a delay in learning of a court's denial of relief may entitle a habeas petitioner to equitable tolling. *See Jenkins*, 330 F.3d at 1155-56 (in order to demonstrate tolling, petitioner entitled to develop claim that he did not receive notice of state court decision for lengthy period). On the other hand, even assuming that a presumably routine and short delay in learning of a denial such as what appears to have occurred in Petitioner's case could constitute an impediment beyond Petitioner's control, here it would not have made it impossible for Petitioner to file his habeas petition in a timely fashion because this circumstance was long over when Petitioner delayed essentially an entire year in filing the 2007 action after completing habeas review in 2006 in the state courts. Adding this to the fact that Petitioner clearly was able to pursue habeas relief in this Court in 2006 as he did so in the action initiated in this Court in 2005, it does not appear that Petitioner is entitled to equitable tolling sufficient to render the 2007 Petition timely. *Bryant*, 499 F.3d at 1061.

However, even assuming that the claims were timely presented to this Court, they should be denied on their merits, as explained below.

## XII.

Petitioner argues that his attorney performed deficiently when he did not submit evidence showing Petitioner was fit to be tried as a juvenile. (2007 Petition, at 5, att.) Specifically, Petitioner says counsel should have corrected errors in the probation report to show that Petitioner was not involved in two incidents alleged therein and that counsel should have provided evidence to the judge concerning Petitioner's "mental/social history" to show that, among other things, Petitioner had a short attention span, was immature, had been diagnosed with attention deficit disorder, had a poor relationship with his step-father, responded well to limits and structure, and "suffer[ed] from sexual molestation." (*See id.*)

1            A juvenile is entitled to effective assistance of counsel at juvenile fitness

2  proceedings. *Kent v. United States*, 383 U.S. 541, 561-62, 86 S. Ct. 1045, 16 L. Ed. 2d 84

3  (1966); *Barker v. Estelle*, 913 F.2d 1433, 1440 (9th Cir. 1990). As noted above, in order

4  to warrant relief, Petitioner must demonstrate both that counsel's performance was

5  deficient and that the deficient performance prejudiced the defense at the juvenile

6  proceedings. *Strickland*, 466 U.S. at 687. Again, under *Strickland*, counsel's deficient

7  performance prejudices a petitioner only where there is a "reasonable probability that, but

8  for counsel's unprofessional errors, the result of the proceeding would have been

9  different." *Id.*, 466 U.S. at 694.

10          Petitioner cannot demonstrate prejudice from any failure by counsel to present

11  this evidence. Under California law, the juvenile court was to consider a probation report

12  and any other evidence submitted by Petitioner to determine whether Petitioner was fit for

13  trial as a juvenile. *See* CAL. WELF. & INST. CODE § 707(b), (d) (1999). In order to

14  demonstrate his fitness for trial as a juvenile, Petitioner would have had to have shown that

15  he was fit under the following five criteria: (1) the degree of criminal sophistication

16  exhibited by the minor; (2) whether the minor can be rehabilitated prior to the expiration

17  of the juvenile court's jurisdiction; (3) the minor's previous delinquent history; (4) success

18  of previous attempts by the juvenile court to rehabilitate the minor; and (5) the

19  circumstances and gravity of the offenses alleged in the petition to have been committed

20  by the minor. CAL. WELF. & INST. CODE § 707(d)(1) (1999) ("A determination that the

21  minor is not a fit and proper subject to be dealt with under the juvenile court law may be

22  based on any one or a combination of the factors set forth above.").

23          Here, the juvenile court found Petitioner not fit for trial as a juvenile. In its

24  March 7, 2000 order to this effect, the court explained that it found Petitioner unfit due to:

25

26          ●  The degree of criminal sophistication,

27          ●  Minor cannot be rehabilitated during juvenile court

28                jurisdiction,

1          •    Previous delinquent history,

2          •    Prior attempts to rehabilitate minor,

3          •    The circumstances and gravity of the offense.

4

5    (*See* Lodgment No. 21, Appendix, at 4-6.)   Petitioner cannot show that it was his

6    attorney's deficient representation that led to the court's negative findings.

7                 First, Petitioner's crime was especially serious and the evidence suggested it

8    was planned in advance.   Under California law, where a minor is alleged to have

9    committed a violent crime such as those of which Petitioner stood accused, in order to

10   show his fitness for juvenile treatment, the minor he must demonstrate "that his

11   participation was not as grave or serious as the charge would initially lead a court to

12   conclude." *People v. Superior Court (Jones)*, 18 Cal. 4th 667, 682, 685, 76 Cal. Rptr. 2d

13   641 (1998).  Petitioner does not show, by any of the allegedly omitted evidence, that his

14   participation was not so grave that he could be found fit under either of these two criteria.

15   *See e.g. id.*, 18 Cal. 4th at 683-86 (where minor actively participated in planned robbery

16   with a firearm that resulted in murder, he was not fit for trial as a juvenile); *see also People*

17   *v. Superior Court (Zaharias M.)*, 21 Cal. App. 4th 302, 25 Cal. Rptr. 2d 838 (1993)

18   (where minor actively participated in armed robbery, he was not fit for trial as a juvenile

19   under the criteria of the degree of sophistication of the crime and the gravity of the

20   offense); *and compare Rene C. v. Superior Court*, 138 Cal. App. 4th 1, 7, 12-13, 41 Cal.

21   Rptr. 3d 71 (2006) (minor rebuts presumption of unfitness with respect to gravity of the

22   crime of murder where minor suffers from "organic brain dysfunction" and "mental

23   retardation").   Therefore, even assuming counsel had put forth all of the evidence

24   Petitioner contends he should have, Petitioner still could not demonstrate that it was

25   counsel's performance that led to the unfit findings regarding the nature and circumstances

26   of the crime.

27                 Further, the factual discrepancies and mental history Petitioner wishes counsel

28   had emphasized to the juvenile court would not have tipped the balance on the remaining

1   three factors. The information provided now by Petitioner is so equivocal or unimportant

2   that there also is not a reasonable probability that any of it (or all of it) would have

3   influenced the juvenile court in his favor. For example, Petitioner wished the court to

4   understand that he did not take part in two isolated criminal acts alleged against him in the

5   probation report, but does not offer any defense to the numerous other serious crimes with

6   which he has been charged over the years. (*See* Lodgment No. 21, Appendix, at 8-13.)

7   The equivocal and/or unsupported mental and social conditions put forth by Petitioner also

8   would not have resulted in a different outcome. (*See id.*, at 18-24.)

9         Petitioner has not shown that any different conduct by his attorney would

10   have resulted in his being found fit for trial as a juvenile. Petitioner's participation in the

11   violent crimes was not minor or mitigated. The evidence to which Petitioner points now

12   pales in comparison to the evidence of Petitioner's active participation in the crimes and

13   his criminal and delinquent history. Petitioner has not demonstrated that the state courts

14   unreasonably denied his ineffective assistance of counsel claims. 28 U.S.C. § 2254(d).

15

16                               **XIII.**

17         Petitioner's final claim is not entirely clear. It appears most likely that he

18   contends that the juvenile court violated his due process rights when it did not take any

19   action to determine whether counsel had done an adequate job of investigating Petitioner's

20   case. (2007 Petition, at 5, att.) Under state law, the juvenile's fitness is to be determined

21   by reliance upon a probation report (as the juvenile court had before it) and then upon any

22   other evidence put forth by the minor. Cal. Welf. & Inst. Code § 707(d) (1999).

23   Petitioner offers no legal authority for the proposition that the court had any obligation to

24   investigate counsel's performance and no factual support for the proposition that the court

25   should have been on notice of any alleged deficiency by counsel.

26         Further, to the extent Petitioner contends that the juvenile court abused its

27   discretion under state law in finding him unfit, he raises only a state law claim that cannot

28   entitle him to federal habeas relief. 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68.

Finally, even liberally construing Petitioner's claim to be one of insufficient evidence to support the judicial finding of unfitness, Petitioner still is not entitled to relief. The standard for evaluating a constitutional claim of sufficiency of the evidence, which the Court will assume for purposes of argument is applicable to a claim such as Petitioner's, is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original).  For all the reasons explained in section XII above, there was sufficient evidence to find that Petitioner did not satisfy the fitness criteria.  CAL. WELF. & INST. CODE § 707(d) (1999).

## XIV.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Report and Recommendation; and (2) directing that judgment be entered denying the 2005 First Amended Petition and the 2007 Petition and dismissing the consolidated action with prejudice.

DATED:   November _5_, 2007


_____
RALPH ZAROFSKY
UNITED STATES MAGISTRATE JUDGE